## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ERICA R. ZIMMERMAN,　　　　　　　)
an Individual　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　CASE NO. 11-CV-00073-CVE-TLW
vs.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　　(REDACTED VERSION)
AHS, TULSA REGIONAL MEDICAL　　)
CENTER, LLC, d/b/a　　　　　　　　　)
OKLAHOMA STATE UNIVERSITY　　　)
MEDICAL CENTER,　　　　　　　　　　)
a Foreign Limited Liability Company　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　　)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED BRIEF IN SUPPORT

Patrick F. Clark (Admitted in N.D. Okla.)
Georgia Bar No. 170110
Amelia M. Willis (*Pro Hac Vice*)
Georgia Bar No. 055872
OGLETREE, DEAKINS, NASH SMOAK
　　& STEWART, P.C.
191 Peachtree Street NE, Ste. 4800
Atlanta, GA 30303
Telephone:  (404) 881-1300
Facsimile:  (404) 870-1732
patrick.clark@ogletreedeakins.com
amie.willis@ogletreedeakins.com

Bob L. Latham, Jr., OBA #15779
Lance Freije, OBA #18559
LATHAM, WAGNER, STEELE &
　　LEHMAN, P.C.
10441 South Regal Boulevard, Suite 200
Tulsa, Oklahoma 74133
Telephone:  (918) 970-2000
Facsimile:  (918) 970-2002
Email:  blatham@lswsl.com
Email:  lfreije@lswsl.com

ATTORNEYS FOR DEFENDANT

TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE
      ISSUE OF FACT EXISTS.............................................................................................2
      A.   Background......................................................................................................2
      B.   Coworkers Began to Complain About Zimmerman in March 2009........................4
      C.   After Additional Complaints, Zimmerman was Disciplined in April........................5
      D.   Zimmerman Took FMLA Leave .....................................................................6
      E.   Hospital Received Anonymous Complaint Plaintiff was on Drugs......................8
      F.   Zimmerman's Was Written Up for Poor Performance and Bizarre Behavior.................11
      G.   Zimmerman Interfered in Patient Care and Behaved Inappropriately ...................... 12
      H.   Zimmerman's 2009 Performance Evaluation was not Due Prior to Discharge...................14
      I.   Additional Relevant Facts .........................................................................15

III.  ARGUMENT AND CITATION OF AUTHORITY...........................................................15
      A.   Standard for Summary Judgment.................................................................15
      B.   Defendant is Entitled to Summary Judgment on Plaintiff's ADA Discrimination Claim......15
           1.   Plaintiff's Prima Facie Case ...................................................................15
                a.   Plaintiff's FMLA retaliation claim prevents showing that disability was
                     the sole reason.......................................................................16
                b.   Behaviors wholly unrelated to disability ...............................17

           2.   Plaintiff Cannot Show Pretext ...........................................................18
                a.   There are no comparators................................................................19
                b.   Plaintiff cannot link conduct and behaviors to her disability.................20
                c.   Linking conduct or behaviors to disability is not enough. ....................21

      C.   Defendant is Entitled to Summary Judgment on Plaintiff's Failure To
           Accommodate Claim ...........................................................................22
           1.   Burden of Proof and Elements...................................................................22
           2.   Plaintiff cannot show the Hospital failed to accommodate her ......................22
                a.   Plaintiff was given the only accommodation she requested. ......................22
                b.   Hospital unaware of need for accommodation............................................22

      D.   Defendant is Entitled to Summary Judgment on Plaintiff's FMLA
           Retaliation Claim ...........................................................................23
           1.   No Causal Connection ...........................................................................24

      E.   Defendant is Entitled to Summary Judgment on Plaintiff's *Burk* Public Policy
           Tort Claim...........................................................................25
           1.   Employment discrimination claims under *Burk* have been eliminated........................25
           2.   Plaintiff's state law discrimination claim fails on the merits.................................25

IV. CONCLUSION..............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................15

*Ballandby v. Belger Cartage Serv.*, No. 10-cv-0339-CVE-FHM, 2011 WL 2982480
    (N.D. Okla. July 22, 2011)......................................................................................................24

*Barnes v. Occidental Petroleum Corp.*, 761 F. Supp. 2d 1285 (N.D. Okla. 2010) ......................25

*Burk v. K-Mart Corp.,* 770 P.2d 24, 28-29 (Okla.1989)...........................................................2, 25

*Culver v. Birmingham Bd. Of Ed.*, 646 F. Supp 2ⁿᵈ .......................................................................17

*Davidson v. America Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003)..............................................22

*Davila v. Qwest Corp. Inc.,* 113 F.App'x. 849 (10th Cir. 2004) .................................................21

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117 (10th Cir. 2003).........................................24

*Emberger v. Deluxe Check Printers*, No. 96-7043 1997 WL 677149 ...........................................21

*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011) .................................................23

*Exum v. U. S. Olympic Comm.*, 389 F.3d 1130 (10th Cir. 2004)............................................18, 21

*Felix v. City & Cnty of Denver*, 729 F. Supp. 2d 1243 (D. Colo. 2010).......................................24

*Gross v. FBL Fin. Serv.*, 129 S. Ct. 2343 (2009).....................................................................16, 17

*Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047 (5th Cir. 1998)......................................21

*Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999) .......................................21

*Jankovich v. Exelon Corp.*, 73 F.App'x. 881 (7th Cir. 2003).......................................................20

*Jones v. Denver Post Co.*, 203 F.3d 748 (10th Cir. 2000) ............................................................19

*Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871 (1990) ....................................................................15

*MacKenzie v. City & Cnty of Denver*, 414 F.3d 1266 (10th Cir. 2005) .......................................18

*McKinney v. JB Hunt Transp.*, 193 Fed. Appx. 373 (5th Cir. 2006)............................................20

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997) .................................................................24

*Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219 (10th Cir.2008) ...................................15

*Nwagbologu v. Regents of Univ. of N.M.*, 33 F.App'x. 449 (10th Cir. 2000) ...............................20

*Randolph v. Bd. of Pub. Util.*, 983 F. Supp. 1008 (D. Kan. 1998) ................................................20

*Rennard v. Woodworker's Supply, Inc.*, 101 F.App'x. 296 (10th Cir. 2004) ..................................16

*Rose v. Laskey*, 110 F.App'x. 136, 139 (1st Cir. 2004) ..................................................................21

*Ross v. Independent Living Resource*, No. C08-00854, 2010 WL 2898773 (N.D. Cal. July 21, 2010) ..............................................................................................................................16

*Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007) .................................................................................17

*Serwatka v. Rockwell Automation Inc.*, 591 F.3d 957 (7th Cir. 2010) ..........................................16

*Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995)............................................21

*Sizemore v. State of N.M.*, 182 F.App'x. 848 (10th Cir. 2006).......................................................19

*Whitaker v. Tennessee Valley Auth. Bd. of Dir.*, No. 08-1225, 2010 WL 1493899 ......................17

*White v. York Int'l*, 45 F.3d 357 (10th Cir. 1995)..........................................................................22

*Williams v. Widnall*, 79 F.3d 1003 (10th Cir. 1996).......................................................................16

## FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

Americans with Disabilities Act ("ADA"..........................................1, 2, 15, 16, 17, 18, 21, 23, 25

ADA Amendments Act of 2008, H.R. Rep. No. 110-730 (II)(2008) (*available at*, 2008 WL 2502301, at 18) ("ADAAA"). ...................................................................................16, 17

Family and Medical Leave Act...................................1, 2, 6, 7, 8, 14, 15, 16, 17, 18, 22, 23, 24, 25

Fed. R. Civ. P. 56 and LCvR7.2 and LCvR56.1 .............................................................................1

Title VII ..........................................................................................................................................16, 17

## STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

Oklahoma Anti-Discrimination Act.  Sen. 837, 53rd Leg., 1st Reg. Sess. (Okla. 2011), *available at* https://www.sos.ok.gov/documents/legislation/53rd/2011/1R/ SB/837.pdf ...............................................................................................................................25, 26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ERICA R. ZIMMERMAN,        )
an Individual                  )
        Plaintiff,          )
                            )     CASE NO. 11-CV-00073-CVE-TLW
v.                       )
                            )
AHS, TULSA REGIONAL MEDICAL    )
CENTER, LLC,               )
                            )
        Defendant.      )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## MEMORANDUM OF LAW IN SUPPORT

COMES NOW Defendant AHS Tulsa Regional Medical Center, LLC, by and through its counsel of record, and pursuant to Fed. R. Civ. P. 56 and LCvR7.2 and LCvR56.1, files this Motion for Summary Judgment and Memorandum of Law in Support moving this Court to dismiss Plaintiff's remaining claims[1] in their entirety.

### I.    INTRODUCTION

Plaintiff Erica Zimmerman alleges claims arising out of her employment at Hillcrest Medical Center ("Defendant" or "the Hospital"). She alleges disability discrimination under the Americans with Disabilities Act ("ADA") and Oklahoma state law, including a failure to accommodate claim, which claims are premised upon the alleged disability of depression/anxiety. She also alleges retaliation under the Family and Medical Leave Act ("FMLA"). However, there are no genuine issues of material fact as to any of these claims. Plaintiff's ADA claims fail because she cannot prove that she was discriminated against "solely" on the basis of a disability. In addition, Plaintiff cannot show that the Hospital's legitimate business reasons for the actions it took were pretextual. Plaintiff exhibited poor performance and

---

[1] On June 23, 2011, Plaintiff voluntarily dismissed her Intentional Infliction of Emotional Distress claim. [Dkt. 23].

engaged in bizarre and inappropriate conduct, including interfering with patient care, all of which led to her termination. Further, the Hospital approved Plaintiff's request for FMLA leave, which Plaintiff concedes was the only accommodation she ever requested. Plaintiff's FMLA retaliation claim fails due to the lack of a causal connection and also for lack of evidence of pretext. Finally, Plaintiff's *Burk* public policy tort claims fail because the Oklahoma legislature has eliminated such causes of action, and in any event, fail for the same reasons as Plaintiff's ADA claims.

## II.  STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE OF FACT EXISTS

### A.  Background

1.  The Hospital is a 691-bed full-service hospital. (Willis Decl. ¶ 2).

2.  The Hospital's Emergency Room ("ER") opens onto 12th Street in Tulsa, just off Utica Avenue. (Willis Decl. ¶ 2).

3.  The Hospital has surveillance cameras at various locations inside the ER and outside the ER facing 12th Street where the ambulances pull up. (Willis Decl. ¶ 3).

4.  Plaintiff Erica Zimmerman was hired to work at the Hospital in 1999 as a Registration Representative ("Registration Rep"). (Plaintiff's dep. 96-97).

5.  Patient Access Manager Julie Willis hired Zimmerman (Willis dep. 5, 13, 14) and was Zimmerman's manager throughout her employment. (Pl's dep. 135).

6.  In 2005, Zimmerman began working as a Registration Rep in the ER, and began reporting directly to Registration Supervisor Sandra Moore. (Moore dep. 12-13, 16, 28-29).

7.  Moore reports directly to Willis. (Willis dep. 5, 6).

8.  The essential functions of an ER Registration Rep in 2009 included registering ER patients and patients who presented for inpatient stays; collecting co-pays or deposits from

2

patients; communicating clearly with patients, visitors and other Hospital employees to obtain and/or provide information; scanning medical records efficiently and correctly; and correctly completing patient admissions within 15 minutes. (Willis dep. 61, 65-66, 67; *see* Ex. 1; Willis Decl. ¶ 4; *see* Pl's dep. 97, 106, 116-17).

9.      There is a Registration Department standard of getting patients admitted in STAR, the computer software, within 15 minutes, although it normally takes much less than 15 minutes to admit a patient. (Willis Decl. ¶ 5; *see* Pl's dep. 110-11).

10.     Inpatients normally took about 5 minutes to admit.   For any other patient admission in 2009, once the patient was standing in front of the ER Registration Rep, it should not have taken more than 5 minutes to complete the admission. (Willis Decl. ¶ 5).

11.     Registering a patient included obtaining demographic and insurance information and then entering it into the computer.  (Willis Decl. ¶ 4).

12.     Scanning medical records involved putting the patient's chart in a particular order and entering certain information and departmental codes into the computer so that the records would be saved in the proper place. *Id.*

13.     In May 2008, Moore and Willis promoted Zimmerman to Lead or Senior Registration Rep. (Pl's dep. 104; Willis dep. 15).

14.     A Lead Registration Rep is not a supervisor position; rather, the Lead has the same responsibilities as a Registration Rep and, in addition, is responsible for ensuring all of the shift tasks are completed and answering employee questions and is expected to set an example for other employees to follow.  (Willis dep. 59; 135; Pl's dep. 146).

15.     During the relevant time period, Zimmerman worked most often with Registration

3

Reps Courtney Cantrell, Binoy Luke, Teresa Harper[2] and sometimes Diane Peterson. (Willis dep. 132).

     16.     Zimmerman worked full-time, Sunday through Wednesday. (Pl's dep. 104-105).

**B.**     **Coworkers Began to Complain About Zimmerman in March 2009**

     17.     On March 11, 2009, Cantrell complained to Willis that, although Zimmerman had worked with her the previous night, Cantrell had essentially worked alone. (Willis Decl. ¶ 11). Specifically, Zimmerman 1) had been slow, taking 30 minutes to admit one patient; 2) had been on excessive personal calls; 3) by about 2:30 a.m., kept acting like she was falling asleep; 4) had been habitually late for work lately; 5) had been frequently leaving the department and specifically, was missing for the first 30-45 minutes of her shift on the previous Monday; and 6) had not maintained a professional appearance. (Willis Decl. ¶ 10; Willis dep. 29, 31-32; Ex. 2, 8, p. HMC 1019).

     18.     Also on March 11, 2009, Harper complained to Willis that Zimmerman: 1) had been coming to work with an unprofessional appearance – dark circles under her eyes and frazzled hair; 2) was always tired or possibly high; 3) spent excessive time on personal calls; 4) had been late every shift; and 5) was frequently disappearing from the department, including a 20-minute trip to her car to get a power drink. (Willis Decl. ¶ 11; Willis dep. 31-32, 90; Ex. 2, 8, p. HMC 1023).

     19.     On March 19, 2009, there were additional complaints that Zimmerman had been taking excessive personal calls at work and had not been helping complete departmental tasks. (Willis Decl. ¶ 12; Willis dep. 30-31; Ex. 2, 3, p. HMC 331).

     20.     As a result of the March 2009 complaints, Willis met with Zimmerman on March 25, 2009 in a verbal coaching session. (Willis dep. 32, 34; Ex. 2). Willis apprised Zimmerman

---

[2] At some point, Teresa Harper changed her last name to Matlock. (Willis Decl. ¶ 8).

of the coworkers' complaints and instructed Zimmerman 1) to stay in the department unless she was on an official break; 2) to clock out if she goes outside to smoke; 3) to work on her appearance; 4) to complete patient admits within the 15-minutes standard; and 5) that future complaints would lead to formal discipline. (Willis dep. Ex. 2).

21.     Zimmerman testified that Willis told her on March 25 that "she cared about me… she'd do anything she could to help me, if I needed any help at all, no matter what." (Pl's dep. 141). Willis also told Zimmerman that her coworkers were concerned she was on drugs[3] and Zimmerman responded that she was trying to adjust to a new prescription medication. (Pl's dep. 135-36).

22.     The record evidence shows that the only medication Zimmerman was taking in March 2009 was Phenzene, an amphetamine prescribed by a weight loss doctor. (Exhibit B hereto, PATTERSON 002, 005; *see* Pl's dep. 136; Stansill dep. 7).

23.     The very next day, March 26, 2009, Zimmerman took approved time off and was out of work for seventeen (17) days, through April 11, 2009. (Willis dep. 125; Ex. 11, p. 17).

24.     Zimmerman saw Dr. Jason Stansill for the first time on April 3, 2009, and he diagnosed her with anxiety and depression. (Stansill dep. 7; Ex. 1, p. STANSILL 002-003).

C.     **After Additional Complaints, Zimmerman was Disciplined in April 2009**

25.     On April 15, 2009, just a couple of days after Zimmerman's return to work, Willis received another complaint: Zimmerman was disappearing from the department for lengthy periods of time and not getting her work done. (Willis dep. 35-38; Ex. 2; Ex. 8, pp. HMC 1020, 1030; Willis Decl. ¶ 14-15).

26.     Zimmerman's time records confirmed her failure to clock out from 3:30 – 4:05

---

[3] Zimmerman testified in her deposition that she had used crystal meth in the past, (*see* Pl.'s dep. 6-7), and has since been incarcerated in connection with possession of crystal meth. (Exhibit C). Further, she tested positive for amphetamines in May 2009. (Undisputed Fact 38).

a.m. and Willis, Moore and two security personnel reviewed video showing Zimmerman out on 12th street kissing a man during that time period. (Moore dep. 105-106, 109-110, 127-28, 149-50; Willis dep. 35-36, 37-38; Pillars Decl. ¶ 7).

27.    Another disappearance involved Zimmerman leaving the Hospital to go to QuikTrip. (Moore dep. 108).

28.    As a result of her continuing disappearances from the department and failure to clock out for these absences, including her rendezvous on 12th Street, as well as her failure to get work done, Zimmerman was given a documented verbal warning on April 15, 2009. (Willis dep. Ex. 2; Moore dep. 91; Ex. 5).

29.    During Willis and Zimmerman's April 15, 2009 meeting, Zimmerman said her problems were due to her "coping skills" being down, all the drama in her life and trying to adjust to new medication. She talked about taking a leave of absence "to try to get her life back in order" and Willis offered her a 30-day leave. (Willis dep. 41; Ex. 2; Pl's dep. 147).

30.    On April 20, 2009, Cantrell again complained that Zimmerman was not completing work and that things had gotten worse in the previous two weeks. (Willis Decl. ¶ 16; Willis dep. Ex. 8, p. HMC 1021).

31.    Also on April 20, 2009, Luke complained that Zimmerman had been rude to him and blamed it on her personal problems, including depression and medication. (Willis Decl. ¶ 16; Willis dep. Ex. 8, p. HMC 1027).

**D.    Zimmerman Took FMLA Leave**

32.    On April 21, 2009, Zimmerman visited Dr. Stansill and they discussed FMLA leave. (Stansill dep. 27-28). Dr. Stansill wrote an informal note seeking FMLA leave for Zimmerman. (Stansill dep. 27-28; Ex. 2, p. 3).

33.    The same day, April 21, 2009, Zimmerman completed her FMLA application and

was immediately granted FMLA leave. (Pillars Decl. ¶¶ 7-8; Ex. A, p. 17; Ex. B).

34.     Later, on April 22, 2009, Dr. Stansill completed the FMLA medical certification. (*See* Stansill dep. 29; Ex. 2, p. 9). Dr. Stansill stated Zimmerman would be incapacitated for a single continuous period of time and that her condition would cause flare-ups, but it would <u>not</u> be medically necessary for her miss work during the flare-ups. (Stansill dep. 32-33; Ex. 2, p. 8).

35.     April 21, 2009, was the first notice Willis received that Zimmerman had been diagnosed with depression. (*See* Willis dep. 43).

36.     The April 2009 FMLA leave was the first and only request Zimmerman ever made for an accommodation. (Pl's dep. 150; *see* Pl's dep. 149, 197).

37.     Dr. Stansill originally estimated that Zimmerman would be out of work until June 15, 2009. (*See* Pl's dep. 150; Stansill dep. 27-28; Ex. 2, p. 3).

38.     On May 5, 2009, Zimmerman presented in the Hospital's ER for chest pains and tested positive for amphetamines. (Pl's dep. 208; Exhibit A, p. HILLCREST 039). She claimed that she was on "diet pills," but the physician questioned her veracity as she had not previously disclosed that to him. (*Id.* at Exhibit A, p. HILLCREST 023).

39.     By June 4, 2009, Zimmerman and Dr. Stansill agreed that Zimmerman was ready to return to work. (Pl's dep. 153-54; Stansill dep. 46; Ex. 2, p. 1).

40.     Dr. Stansill released Zimmerman to return to work on June 7, 2009, without restriction. (Stansill dep. 46; *see* Ex. 2, p. 1).

41.     Zimmerman reported for work briefly on June 7, 2009, but could not work because she had forgotten her release. (Willis dep. 139; Ex. 2, p. HMC 317; Ex. 9, p. HMC 20).

42.     Zimmerman then contacted Willis to say she did not feel ready to return to work and requested another week off. (Pl's dep. 154-55).

43.     Willis approved Zimmerman's request for additional time off and Zimmerman eventually returned to work on June 14, 2009. (Pl's dep. 154-55).

44.     Zimmerman said, "Julie [Willis] was always very accommodating, whatever I needed.  She just wanted me to succeed...Whatever I needed, she would do if she could." (Pl's dep. 155).

45.     Zimmerman had taken FMLA leave in 2004-2005 for the birth of her child. (Eccleston Decl. ¶ 13; see Pl's dep. 100-101).  She did not have any problems at work after taking leave in 2004-2005. (Pl's dep. 127).

46.     Moore was on FMLA leave from May 4, 2009 through approximately July 5, 2009. (Moore dep. 155).

**E.      Hospital Received Anonymous Complaint Plaintiff was on Drugs**

47.      The Hospital has a toll-free complaint hotline for employees. (Willis dep. 131).

48.     On or about June 16, 2009, an anonymous caller reported to the hotline that Zimmerman was on drugs as she had come to work appearing ghost-like and was jittery, spastic, pacing and making repeated trips to the restroom. (Eccleston Decl. ¶ 3; Ex. A).

49.     In light of the hotline complaint about Plaintiff being on drugs at work, Human Resources requested that Willis document her actions taken with respect to Zimmerman's performance or behavior. (Eccleston Decl. ¶¶ 3-5; Willis dep. 82-83; Ex. 7, p. HMC 929).

50.     On or about June 22, 2009, Luke complained that on Sunday, June 21, Zimmerman had not gotten her work done. (Willis Decl. ¶ 18; Willis dep. Ex. 8, p. HMC 1026).

51.     Willis then spoke to Luke about his complaint and he said that Zimmerman had been behaving strangely - she had an unbalanced gait, was talking to herself, lost her voice and looked very sleepy. (Willis dep. 53-54; Ex. 5, p. HMC 326).

52.     At Willis' request, Luke later documented his complaint in an email which stated

8

that, on June 21, 2009, Zimmerman had failed to get her work done; had excessive personal calls; took numerous long breaks; disappeared from the department several times; and wasted time looking for her keys, eating cake and talking with personal visitors. (Willis Decl. ¶ 18; Willis dep. 53-54; Ex. 8, p. HMC 1029).

53.    On June 26, 2009, Harper made similar complaints about Zimmerman's June 21 behavior and poor performance, complaining that Zimmerman was sweating profusely, acting jittery, talking a lot to no one in particular, walking around, visiting with three personal guests, taking multiple personal phone calls, disappearing from the department and taking an excessive amount of time to register two patients. (Willis Decl. ¶ 17; Willis dep. Ex. 8, p. HMC 1032). Harper also complained that, on June 22, Zimmerman continued to have excessive personal telephone conversations and was not doing her share of the work. (Willis Decl. ¶ 17; Willis dep. Ex. 8, p. HMC 1032). Finally, Harper complained that on June 23, 2009, Zimmerman was again engaged in excessive personal telephone calls and failed to complete her share of the work. (Willis Decl. ¶ 17; Willis dep. Ex. 2, p. HMC 317; Ex. 8, p. HMC 1032).

54.    On June 29, 2009, Willis met with Zimmerman to discuss the most recent complaints. (Willis Decl. ¶ 19; Willis dep. 83; Ex. 2, pp. HMC 317-18).

55.    During the June 29, 2009 meeting, Zimmerman said that when she first returned to work, she was continuing to have difficulties, but she felt that she was getting better. (Willis Decl. ¶ 19; Willis dep. 83; Ex. 2, pp. HMC 317-381). Zimmerman said she was pacing because "she is not one to sit." *Id.* She admitted to receiving too many personal telephone calls, but contended that other co-workers were on the phone just as much. *Id.*; (Pl's dep. 157). Zimmerman also contended that other co-workers were also leaving to go smoke and not

clocking out.[4]  *Id.*  Willis told Zimmerman that she should report when others break the rules. *Id.*

56.     Willis then spoke with Cantrell, who reported that Zimmerman had been improving and had done very well the previous night. (Willis Decl. ¶ 21; Willis dep. 83; Ex. 2, pp. HMC 317-381).

57.     Based upon Zimmerman and Cantrell's reports that Zimmerman had been improving, Willis told Zimmerman she would not issue any disciplinary action at that time. (Willis Decl. ¶ 21-22; Willis dep. 83; Ex. 2, pp. HMC 317-381).

58.     Zimmerman never related her June 2009 issues to her alleged disability or any medication she may have been taking for it.  (Willis Decl. ¶ 22).  To the contrary, her EEOC charge states, "After I returned from my two month leave, I had my medication and treatment under control..." (Pl's dep. 242-43; Ex. 20).  In fact, she testified at deposition as follows:

> Q: And were you jittery, talking a lot and pacing, unable to sit down?
> A: No more than usual.
> Q: And so you think whatever it was you were doing in June of '09 was the same thing you'd always been doing?
> A: Yes. (Pl's dep. 160).

59.     At deposition, Zimmerman did not relate sweating or shaking to her alleged disability or medication, testifying these symptoms were "nothing new" because "I've always been a sweater.  I sweat in excess" and "shaking I've always done." (Pl's dep. 203).

60.     Willis received positive reports about Zimmerman on June 30 and July 1, (Willis Decl. ¶ 23; Willis dep. Ex. 2, p. HMC 318), and then reported to Human Resources that Zimmerman had made "considerable progress" in the previous week. (Willis Decl. ¶ 24; Willis dep. 86; Ex. 7, pp. HMC 928-931).[5]

---

[4] Willis is not aware of Harper, Luke, Cantrell or Dianne Peterson being smokers.  (Willis Decl. ¶ 20).
[5] Based upon the July 1 information from Willis, Human Resources issued its report in response to the hotline

**F.**   <u>**Zimmerman's Was Written Up for Poor Performance and Bizarre Behavior**</u>

61.   Just a few days later, coworkers again began complaining; Zimmerman had been late for work on July 5,[6] and then on July 6, she called off only an hour before her shift was to start. (Willis Decl. ¶ 26; Willis dep. Ex. 5, p. HMC 328).

62.   On July 8, 2009, Harper complained that Zimmerman had delayed admitting a patient. (Willis dep. 129; Ex. 3, p. 330). Another employee complained that it took Zimmerman over an hour to get three patients out of the department because she had spent an excessive amount of time scanning charts. (Willis Decl. ¶ 27).

63.   Also on July 8, 2009, Moore reported that Zimmerman had been late to work; had red, puffy eyes and shaking hands; her work area was disorganized; she had multiple personal calls and a personal visitor. (Willis dep. 76-77, 78-80; Willis Decl. ¶ 27; Ex. A; Moore dep. 55-56, 57; Ex. 1A, 9). Zimmerman was also having conversations with her reflection, not making sense, and a patient left without providing all of the required information at check-out because of Zimmerman's bizarre behavior. (Willis dep. 77; Ex. 6; Moore dep. 55-57, 74-79; Ex. 1A, Ex. 9).

64.   Zimmerman told Moore she had only had an hour of sleep because she had been arguing with her boyfriend and her kids had kept her up. (Moore dep. 60, 79).

65.   As Zimmerman had been warned on June 29, 2009, the additional, consistent complaints received on July 8, 2009 resulted in a written warning issued to Zimmerman on July 10, 2009. (Willis Decl. ¶ 27; Ex. A; Willis dep. Ex. 2, p. HMC 318).

66.   Zimmerman called off work again on July 12, 2009. (Pillars Decl. ¶ 14). On July 13, 2009, due to five (5) unexcused absences in the previous twelve months, Zimmerman was given a verbal warning for excessive absenteeism. (Moore dep. 178; Ex. 8).

---

complaint about Zimmerman on July 9, 2009. (Eccleston Decl. ¶¶ 8-9; Willis Decl. ¶ 25).
[6] Zimmerman had been over 40 minutes late for her shift on July 5, 2009. (*See* Pillars Decl. ¶ 7).

G.   **The ER Triage Incident and Plaintiff's Ongoing Strange Behaviors and Performance Deficiencies**

67.   On July 24, 2009, triage nurse Dan Charrier reported to Willis that Zimmerman had brought a friend into the ER on July 23 and asked if he would put her friend at the top of the stack of patients to be seen. (Willis dep. 111-12; Ex. 2, p. HMC 319). Charrier told Zimmerman that there were more critical patients ahead of her friend who would have to wait, but when Charrier walked back by, he saw that Zimmerman's friend was being triaged. *Id.* Charrier reported to Willis that Zimmerman had moved her friend's paperwork up in the stack of patients to be seen. (Willis dep. 112; Ex. 2, p. HMC 319).

68.   Zimmerman does not remember the details of the incident, but claims that she merely followed an ER doctor's instructions. (Pl's dep. 182-84).

69.   Although nurses are responsible for triage, not doctors, even if a doctor had told Zimmerman to move her friend's paperwork, Zimmerman's actions interfered with patient care. (Willis dep. 112-13, 137; Willis Decl. ¶ 28).

70.   On July 27, 2009, Harper complained that the night before, Zimmerman had been on excessive personal calls and that, Harper, Luke and Cantrell had done the majority of the work. (Willis dep. 136; Ex. 8, p. HMC 1024).

71.   Willis investigated and found that, during the time frame in question (7:00 p.m. to 11:00 p.m.), Harper admitted 17 patients, Cantrell admitted 12 patients, Luke admitted 9, while Zimmerman completed only 2 admits. (Willis dep. 136-37; Ex. 8, p. HMC 1024).

72.   On July 29, 2009, Registration Rep Denise Andrasko complained that she had arrived at work at 6:30 the previous morning to find the radio playing loudly and Zimmerman dancing around the work area provocatively.   (Willis dep. 133-35; Ex. 8, p. HMC 1028). Zimmerman had also been talking very fast, shaking, "passing gas & laughing very very loudly."

(Willis dep. Ex. 8, p. HMC 1028).

73.    Willis reviewed the security video and saw Zimmerman dancing in a provocative, "very inappropriate" and "weird" way.  (Willis dep. 134-35).  Moore also reviewed the security video and described Zimmerman's "exotic dance" as "flapping hands" and inappropriate. (Moore dep. 101-103).

74.    While Zimmerman did not deny dancing, saying only "I really don't believe I was dancing at work," she admitted that "there's no way you can make it sound appropriate because it wasn't…things like that happened every night." (Pl's dep. 189-90).

75.    Willis is not aware of anyone else dancing.  (Willis Decl. ¶ 29; Willis dep. 106).

76.    On July 30, 2009, Luke complained to Willis about Zimmerman on the July 28 overnight shift, reporting that Zimmerman had excessive personal calls, kept disappearing from the department, and spent an inordinately long time to admit a patient.  (Willis Decl. ¶ 30; Willis dep. Ex. 2, p. HMC 319).  Also on July 30, employee Stephanie Lee reported that, on July 27, 2009, she had seen Zimmerman take some pills and she was concerned about Zimmerman because she seemed "high" – she had been very unsteady, had almost fallen and her eyes were drowsy.  (Willis dep. Ex. 8, p. HMC 1031; Willis Decl. ¶ 31).

77.    Willis also learned on July 30, 2009, that Zimmerman had scanned two patients' charts together on July 28, 2009, and that they went to the unit uncorrected.  (Willis Decl. ¶ 32).

78.    On July 31, 2009, Willis provided documentation of all the reports and complaints she had received between July 24 and 30, 2009 to Human Resources and requested approval to discharge Zimmerman.  (Willis Decl. ¶ 33; Ex. B).

79.    Willis was authorized to skip the next available step in the progressive disciplinary process – unpaid suspension – based upon Zimmerman's actions during the July 23

triage incident. (Willis Decl. ¶ 33; Ex. B).

80. Willis' decision to terminate was based upon Zimmerman continuing to disappear from the department; leaving the Hospital without clocking out; exceeding the 15-minute standard for patient admissions; poor work quality, including scanning two patient charts together; the triage and dancing incidents; and failure to show improvement in the behaviors and conduct previously addressed by disciplinary action. (Willis dep. 115-16, 137-38).

81. Zimmerman met with Willis and Moore on August 3, 2009, and Willis terminated Zimmerman's employment. (Pl's dep. 194).

82. On August 3, 2009, Zimmerman saw Dr. Stansill and reported that she was <u>not having issues with her medications</u>, (Stansill dep. 53-54; Pl's dep. 216-217), but said that she was getting in trouble at work because she may have been "acting weird." (Stansill dep. 54; Pl's dep. 217).

83. Due to Zimmerman's improvement, Dr. Stansill did not understand why she was still having trouble at work and suggested she take some time off to find a new job, noting "fill out FMLA paperwork if that will help her relocate." (Pl's dep. 195-96; Stansill dep. 56; Ex. 1, p. STANSILL 022).

**H.     Zimmerman's 2009 Performance Evaluation was not Due Prior to Discharge**

84. Zimmerman's annual performance evaluation was initially due on or about May 12, 2009. (Moore dep. 29).

85. Since Zimmerman was on FMLA leave at that time, her performance evaluation was not due until sometime after she returned to work on June 14, 2009. (Eccleston Decl. ¶¶ 11-12; *see* Willis dep. 26).

86. In 2009, managers had a 60-day grace period in which to complete performance evaluations. (Eccleston Decl. ¶ 11).

14

87.     At the time of Zimmerman's termination on August 3, 2009, the grace period for completing her performance evaluation had not yet run.  (Eccleston Decl. ¶ 12).

**I.      Additional Relevant Facts**

88.     Zimmerman alleged that her coworkers were targeting her with their complaints, but she does not know upon what basis.  (Pl's dep. 159-60).

89.     Zimmerman admitted that Willis, Moore, Charrier, Harper, Cantrell, Luke and Peterson are truthful people.  (Pl's dep. 105-106; 122, 124, 125-26).

90.     Willis had no reason to believe that any of the employee complaints were motivated by discrimination or in retaliation for Zimmerman's FMLA leave.  (Willis dep. 135).

**III.    ARGUMENT AND CITATION OF AUTHORITY**

**A.      Standard for Summary Judgment**

"Summary judgment is appropriate if there is no genuine dispute over any material fact, and a party is entitled to prevail as a matter of law." *Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219, 1222 (10th Cir.2008) (citations omitted).   To survive summary judgment, Plaintiff must put forth sufficient evidence such that a *reasonable* jury could find in her favor - a mere scintilla of evidence is not enough. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Moreover, "conclusory allegations unsupported by specific evidence will be insufficient to establish a genuine issue of fact." *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 902 (1990).

**B.      Defendant is Entitled to Summary Judgment on Plaintiff's ADA Discrimination Claim.**

1.      Plaintiff's Prima Facie Case

In order to prove a prima facie case of disability discrimination, Plaintiff must show: 1) she is disabled within the meaning of the ADA; 2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) she suffered

discrimination "based solely on h[er] disability." *Williams v. Widnall*, 79 F.3d 1003, 1005 (10th Cir. 1996). Plaintiff cannot establish a prima facie case as to her ADA claim premised upon her termination and the discipline that preceded it because she cannot show that the actions about which she complains were based "solely" on her disability.[7]

### a.  Plaintiff's FMLA retaliation claim prevents showing that disability was the sole reason

The "solely" requirement of the final element of a prima facie case under the ADA established by the Tenth Circuit in 1996[8] is consistent with the U.S. Supreme Court's reasoning in *Gross v. FBL Fin. Serv.*, 129 S. Ct. 2343 (2009). In *Gross*, the court found that the language of the ADEA "does not authorize an alleged mixed-motives age discrimination claim." *Id.* at 2345. In addition, the Court relied upon the fact that Congress did not add a mixed-motives provision to the ADEA at the time it added such a provision to Title VII (in 1991), "even though it contemporaneously amended the ADEA in several ways." *Id.* at 2349. The Seventh Circuit has applied the *Gross* reasoning to an ADA case involving claims that accrued prior to the ADA Amendments Act of 2008, H.R. Rep. No. 110-730 (II) (2008) (*available at*, 2008 WL 2502301) ("ADAAA"). *See Serwatka v. Rockwell Automation Inc.*, 591 F.3d 957, 959-962 (7th Cir. 2010) (mixed-motive analysis does not apply to ADA because ADA does not utilize mixed-motive language and does not cross-reference Title VII's provision rendering employers liable for mixed-motive decisions, although ADA does cross-reference other provisions of Title VII); *Ross v. Independent Living Res.*, 2010 WL 2898773 (N.D. Cal. July 21, 2010) (same). That reasoning

---

[7] To the extent Plaintiff is contending that she was discriminated against based on her disability in that she was not given a performance evaluation in 2009, her evaluation was not due as of the time of her termination. (*See* Undisputed Facts 84-87). In any event, any failure to complete her evaluation was not an adverse action because there is no evidence that the lack of an evaluation had any adverse effect on Plaintiff's job status. *Rennard v. Woodworker's Supply, Inc.*, 101 F.App'x. 296, 308 (10th Cir. 2004) (negative performance evaluation was not adverse job action where record was "devoid of any evidence showing…an adverse effect on plaintiff's job status.").
[8] The 10th Circuit has recognized a mixed-motive defense in ADA cases since 1996. However, the 10th Circuit has not addressed the issue since *Gross*.

is still sound in the wake of the ADAAA. The only ADAAA revision relevant here is:

> No covered entity shall discriminate against a qualified individual [with a disability because of the disability of such individual] on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. (new language is underlined).

H.R. Rep. No. 110-730 (II) (2008) (*available at*, 2008 WL 2502301, at *22); *see* ADA Amendments Act of 2008. "On the basis of" is not defined by the ADA.[9] The legislative history states "[t]his change harmonizes the ADA with other civil rights laws by focusing on whether a person who has been discriminated against has proven that the discrimination was based on a personal characteristic (disability), not on whether he or she has proven that the characteristic exists." H.R. Rep. No. 110-730, * 18. Thus, per the legislative history, the change to "on the basis of disability" had no relation to holding employers liable for mixed-motive decisions and the *Gross* reasoning therefore applies.

Here, Plaintiff has alleged that she was discriminated against on the basis of a disability and because she took FMLA leave. (Pl's dep. 252; *see* Petition). In the wake of *Gross*, where a plaintiff alleges discrimination on the basis of two protected classes, she cannot show she was discriminated against *solely* based upon her disability and summary judgment is proper. *See Whitaker v. Tennessee Valley Auth. Bd. of Dir.*, 2010 WL 1493899, at *5 (M.D. Tenn. Apr. 14, 2010) (granting employer's motion for summary judgment and noting that, post-*Gross*, it is incongruous for a plaintiff to posit alternate theories of age and disability discrimination); *cf. Culver v. Birmingham Bd. of Ed.*, 646 F. Supp. 2d 1272, 1272 (N.D. Ala. 2009) (following *Gross*, a plaintiff cannot "allege alternative proscribed motives, one of which is plaintiff's age.").

### b.   Behaviors wholly unrelated to disability.

---

[9] In other contexts, the Supreme Court has found that "because of" and "based on" are not substantively different. *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 63-64 & n. 14 (2007).

The incongruous nature of Plaintiff's ADA and FMLA claims aside, her prima facie case under the ADA still fails because she cannot show that she suffered discrimination based solely on her disability. Plaintiff's actions in moving her friend to the top of the stack of patients to be seen, as had been reported by the ER triage nurse, led to Human Resources approving her termination without proceeding through the next step available in the discipline process. (Willis Decl. ¶ 32; Ex. B). At no time has Plaintiff related this incident to her disability.[10] Plaintiff has also never related her 12th Street rendezvous to her disability – the incident which led to the April 15 write-up. In addition, Plaintiff has never related other behaviors to her disability – such as the bizarrely inappropriate dancing – which were factors in her termination. Thus, Plaintiff cannot show that the actions she complains of were solely on the basis of her alleged disability.

2.    Plaintiff Cannot Show Pretext

Even if this Court assumes Plaintiff has shown a prima facie case of disability discrimination, she still cannot prevail. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *MacKenzie v. City & Cnty of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005). The burden then shifts back to plaintiff to show the defendant's reason is pretextual. *Id.* It is not enough for Plaintiff to show that the facts relied on by Defendant for the employment actions were inaccurate or that the decisions were otherwise ill-advised; instead, "[she] must call into question the [employer's] honesty or good faith." *Exum v. U. S. Olympic Comm.*, 389 F.3d 1130, 1137-38 (10th Cir. 2004). The Hospital has articulated legitimate, nondiscriminatory reasons for terminating her employment – poor performance and numerous instances of bizarre and/or inappropriate behaviors. As evidence of pretext, Plaintiff claims that one or more of her

---

[10] Rather, she has attempted to defend whatever she did (she cannot recall) on that occasion by claiming that she was following directions from an ER physician. Willis testified that, irrespective of any physician involvement, Plaintiff's actions were inappropriate. (Willis dep. 137, Willis Decl. ¶ 28).

coworkers engaged in *some* of the same behavior underlying her termination and were not terminated. (*See* Petition, ¶ 21). She also alleges that, even if engaged in the behaviors, then Defendant's basis for its actions is discriminatory because her behaviors were caused by her disability or the related medications. (*See* Petition, ¶ 18). As shown below, these arguments fail.

**a.**    **There are no comparators.**

Plaintiff's termination was the result of a whole host of incidents, including poor performance, habitual unauthorized disappearances from the department (and failures to clock out), excessive personal calls and visitors, failing to finish a patient registration, the ER triage incident and the bizarre ER dancing. Indeed, Willis had never received so many complaints from so many coworkers and non-coworkers (i.e., the ER triage nurse) about so many different issues as she did about Plaintiff. (Willis Decl. ¶ 34). Plaintiff attempts to create an issue of fact as to the existence of a comparator by pointing to Cantrell and the single bizarre dancing incident, alleging that Cantrell was dancing too. First, Willis reviewed the surveillance video and saw Cantrell watching, not dancing. (Willis dep. 106). Beyond that, Willis is unaware of any employee, including Cantrell, ever dancing in the ER. (Willis Decl. ¶ 28). See *Jones v. Denver Post Co.*, 203 F.3d 748, 756 (10th Cir. 2000) (proffered comparator fails when "there is no evidence in the record that any supervisor was aware of the alleged mistakes committed by fellow employees."). Ultimately, irrespective of Willis' awareness and, even if Cantrell did dance in the ER and other employees took personal calls or went to smoke without clocking out, which Plaintiff also contends[11], Plaintiff still fails to create an issue of fact as to an appropriate comparator for the myriad additional factors underlying her termination. *See Sizemore v. State of N.M.*, 182 F. App'x. 848, 853 (10th Cir. 2006)(plaintiff not similarly situated to employee who engaged in one policy violation when plaintiff was terminated for numerous additional

---

[11] Willis is not aware of Harper, Luke, Cantrell or Dianne Peterson being smokers. (Willis Decl. ¶20).

violations); *Nwagbologu v. Regents of U.N.M.*, 33 F. App'x. 449, 452 (10th Cir. 2000)(same); *Jankovich v. Exelon Corp.*, 73 F. App'x. 881, 884 (7th Cir. 2003)("Employees are not similarly situated when relatively minor complaints about one employee pale in comparison to numerous, more serious complaints about the other.") (internal cites and quotes omitted); *McKinney v. JB Hunt Transp.*, 193 F. App'x. 373, 374 (5th Cir. 2006) (plaintiff had numerous complaints against her and instances of unprofessional conduct unlike her proffered comparator); *Randolph v. Bd. of Pub. Util.*, 983 F. Supp. 1008, 1014 (D. Kan. 1998) (coworkers not similarly situated to plaintiff where complaints against them "were isolated complaints that were never corroborated by any other employees...[but] the complaints against [plaintiff], on the other hand, were corroborated by at least six separate individuals...").

**b.      Plaintiff cannot link conduct and behaviors to her disability.**

Plaintiff's claim that disciplining her for behaviors, such as pacing, unbalanced gait and profuse sweating, was discriminatory is similarly unavailing.   However, Plaintiff has not associated these behaviors with her disability or related medications.   (Willis Decl. ¶ 21; *see* Stansill dep. 17, 18, 53; Ex. 1, p. STANSILL 021).   To the contrary, Plaintiff has continually underline denied such a connection.   She told Moore that she was dozing off because she was tired from fighting with her boyfriend and her kids had kept her up.   (Moore dep. 60, 79).   Plaintiff testified that her behavior in June 2009 was normal; specifically, the reported sweating, pacing, shaking, jitters, and excessive talking were not new to her.   (Pl's dep.  160, 203).   She stated in her EEOC charge, "After I returned from my two month leave, I had my medication and treatment under control..." (Pl's dep.  242-43; Ex. 20).   As to other behaviors, such as her failures to clock out when she left the Hospital, the excessive phone calls and the dancing, Plaintiff simply claims, not that they were disability-related, but that others did it, too. (Pl's dep.  159, 168, 190, 192).   Thus, discipline based on such behaviors had nothing to do with Plaintiff's disability.

c.      **Linking conduct or behaviors to disability is not enough.**

Even assuming Plaintiff's odd behaviors were the result of her disability or medications, she still cannot prevail. ADA plaintiffs' attempts to prove discrimination simply by linking the challenged behavior to a disability have been rejected by the courts. *See Davila v. Qwest Corp. Inc.,* 113 F. App'x. 849, 854 (10th Cir. 2004)(rejecting ADA plaintiff's argument that employers must excuse conduct stemming from a disability); *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) (finding policeman discharged after erratically driving squad car due to failure to monitor diabetes was not discriminated against and holding "The ADA does not…erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions…"); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (employee who verbally abused and hit a coworker due to PTSD "can not hide behind the ADA and avoid accountability for his actions…"); *Rose v. Laskey*, 110 F. App'x. 136, 139 (1st Cir. 2004) (employee who threatened coworker due to depression "was discharged because of his unacceptable behavior rather than because of any mental impairment"); *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (employee terminated for falling asleep due to medication side effects "was fired for sleeping on the job, not for her medical condition or her need to take medications"); *Emberger v. Deluxe Check Printers*, 1997 WL 677149, at **5-6 (E.D. Pa. Oct. 30, 1997) (depression explained inappropriate behavior, but did not excuse it).

Far from calling into question the Hospital's honesty or good faith with respect to the actions it undertook, *see Exum*, 389 F.3d at 1137-38, the evidence shows that the Hospital gave Plaintiff every opportunity to succeed. On June 7, 2009, Willis granted Zimmerman's personal request to extend her leave another week, despite the fact that Zimmerman had no medical justification, having been released without restriction on June 7. Further, on June 29, 2009,

despite complaints from Harper and Luke, Willis decided to rely upon Cantrell and Zimmerman's reports that Zimmerman was doing better and decided not to issue any disciplinary action at that time. The record evidence belies any discriminatory intent.

**C.    Defendant is Entitled to Summary Judgment on Plaintiff's Failure To Accommodate Claim**

1.    Burden of Proof and Elements

To establish a prima facie case of failure to accommodate, it is Plaintiff's burden to produce sufficient competent evidence that: (1) she was disabled; (2) she was qualified, with or without reasonable accommodation (that she must describe), to perform the essential functions of her job; and (3) Defendant failed to make reasonable accommodations to her known limitations. *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003); *White v. York Int'l*, 45 F.3d 357, 360 (10th Cir. 1995).

2.    Plaintiff cannot show the Hospital failed to accommodate her.

**a.    Plaintiff was given the only accommodation she requested.**

Even if this Court were to find that Plaintiff was otherwise qualified for her position, the Hospital did not deny her accommodation. Here, Plaintiff was granted the only accommodation she ever requested – FMLA leave. (*See* Pl's dep. 149-50, 197). She was released to return to work without restriction on June 7, 2009. (Pl's dep. 153-54; Stansill dep. 46; Ex. 2, p. 1). Zimmerman then called Willis and requested another week simply because she did not feel ready to return. (Pl's dep. 154-55). Willis granted that request. (Pl's dep. 154-55). In addition, in March 2009, almost immediately after her first verbal coaching, and prior to being diagnosed or put on any medication for anxiety or depression, Zimmerman had been granted time off and was out of work for 17 days. (Willis dep. 125; Ex. 11, p. 17).

**b.    Hospital unaware of need for accommodation.**

A plaintiff's request for accommodation "must make clear that the employee wants assistance *for his or her disability*." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (emphasis in original) (internal cites omitted). In *C.R. England*, the plaintiff alleged that he was denied the accommodation of leave time due to his HIV+ status, a condition known to his employer. At the time the plaintiff sought leave, he requested "family time" and on another occasion, to see his doctor for stress. The Tenth Circuit held that the plaintiff failed to put his employer on notice that he was seeking the leave due to his disability and thus, his requests did not trigger his employer's ADA duty to accommodate. *Id.* at 1050. Therefore, under *C.R. England*, an employer's knowledge of a disability is not sufficient to trigger the duty to accommodate.

Zimmerman was required under the ADA to: 1) seek an accommodation; and 2) put the Hospital on notice that it was due to her alleged disability. But, she did neither. Here, Plaintiff did not request any accommodation after she returned from FMLA leave. Further, after Plaintiff returned from FMLA leave, she never related any of her bizarre behavior or performance difficulties to her disability or the associated medications. (Willis Decl. ¶ 21; *see* Stansill dep. 17, 18, 53; Ex. 1, p. STANSILL 021). As explained, *supra*, she has expressly denied any such connection. Thus, the Hospital was under no duty to accommodate Plaintiff after her FMLA leave. Moreover, Plaintiff has essentially conceded that had she made any such request, which she did not, it would have been granted. In that regard, Plaintiff testified "Julie [Willis] was always very accommodating, whatever I needed. She just wanted me to succeed.... Whatever I needed, she would do if she could." (Pl's Dep. 155).

### D.   Defendant is Entitled to Summary Judgment on Plaintiff's FMLA Retaliation Claim

To establish a prima facie case of retaliation, Plaintiff must show (1) protected activity;

(2) an adverse employment action; and (3) a causal connection between the two. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003).

    1.   <u>No Causal Connection</u>

    There is no evidence that Plaintiff's FMLA leave was the basis for her disciplinary actions or the failure to complete her performance evaluation.[12] Plaintiff has complained that she was disciplined more after returning from FMLA leave on June 14, 2009. But, the undisputed evidence shows the disciplinary process related to Plaintiff's behaviors began on March 25, 2009 and continued on April 15, 2009, <u>preceding</u> Plaintiff's request for FMLA leave. The fact that the disciplinary process resumed after her leave is connected to the Hospital's receipt of more and more complaints about Plaintiff, including a hotline complaint, and not to the fact that she had taken FMLA leave. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) ("[e]ven assuming that Morgan has established a prima facie case of retaliation, we cannot find that she has raised an inference of pretext. Hilti issued oral and written warnings about the consequences of poor attendance both before and after August 3, 1994, when she filed the charge of discrimination. The additional warnings, followed by discharge on January 16, 1995, simply completed the disciplinary process already set in motion."); *Ballandby v. Belger Cartage Serv.*, 2011 WL 2982480 (N.D. Okla. July 22, 2011) (granting summary judgment on workers compensation retaliation claim and noting that plaintiff's evidence of disciplinary actions lends little or no support to his retaliation claim as he was repeatedly disciplined both before and after his notice of injury). Further, Plaintiff testified Willis told her "she cared about me...she'd do anything she could to help me, if I needed any help at all, no matter what." (Pl's dep. 141). Indeed, Willis gave Plaintiff an extra week off following her FMLA leave based solely on

---

[12] As previously addressed, the performance evaluation was not due as of Plaintiff's termination and, in any event, the failure to provide the evaluation does not constitute an adverse employment action, even under the relaxed standard used in retaliation cases. *Felix v. City & Cnty of Denver*, 729 F. Supp. 2d 1243, 1257 (D. Colo. 2010).

Plaintiff's request, which was not supported by medical documentation.

Additional facts support the lack of a causal connection. Plaintiff's supervisor, Moore, took FMLA leave during the time Plaintiff was on leave. (Moore dep. 155). Further, Plaintiff had previously taken FMLA leave, while reporting to Moore and Willis, and had experienced no problems as a result. (Eccleston Decl. ¶ 13; *see* Pl's dep. 100-101; Pl's dep. 127). In fact, she was thereafter promoted. (Pl's dep. 104; Willis dep. 15). Plaintiff even testified "Julie [Willis] was always very accommodating, whatever I needed. She just wanted me to succeed…. Whatever I needed, she would do if she could." (Pl's dep. 155).

E. **Defendant is Entitled to Summary Judgment on Plaintiff's *Burk* Public Policy Tort Claim**

1. Employment discrimination claims under *Burk* have been eliminated

In her Petition, Plaintiff alleges "[t]he discrimination committed by Defendant is contrary to Oklahoma's anti-discrimination statute pursuant to the *Burke* (sic) public policy tort." (Petition, ¶ 37). However, the exclusive remedy for employment discrimination in Oklahoma is now[13] under the Oklahoma Anti-Discrimination Act. Sen. 837, 53rd Leg., 1st Reg. Sess. (Okla. 2011), *available at* https://www.sos.ok.gov/documents/legislation/53rd/2011/1R/SB/837.pdf. Accordingly, Plaintiff's *Burk* public policy tort claim fails as a matter of law.

2. Plaintiff's state law discrimination claim fails on the merits

Even if this Court concludes that Plaintiff has properly pled a claim under the Oklahoma Anti-Discrimination Act (instead of merely pursuant to *Burk*), her claims fail on the merits for the same reasons as her ADA claims. *See Barnes v. Occidental Petroleum Corp.*, 761 F. Supp. 2d 1285, 1295 (N.D. Okla. 2010) (granting summary judgment on plaintiff's ADA claim and, as a consequence, *Burk* tort disability discrimination claim, noting same analysis applies).

---

[13] The law goes into effect on November 1, 2011.

## IV.   CONCLUSION

WHEREFORE, for the reasons discussed above, there is no genuine issue of material fact

related to any of Plaintiff's claims and Defendant's Motion for Summary Judgment should be

granted.

Respectfully submitted this 26th day of September, 2011.

/s/Amelia M. Willis_____
Patrick F. Clark (Admitted in N.D. Okla.)
Georgia Bar No. 170110
Amelia M. Willis (*Pro Hac Vice*)
Georgia Bar No. 055872
Christopher M. Caiaccio (*Pro Hac Vice*)
Georgia Bar No. 102002
OGLETREE, DEAKINS, NASH SMOAK
         & STEWART, P.C.
191 Peachtree Street NE, Ste. 4800
Atlanta, GA 30303
Telephone:  (404) 881-1300
Facsimile:  (404) 870-1732
patrick.clark@ogletreedeakins.com
amie.willis@ogletreedeakins.com
chris.caiaccio@ogletreedeakins.com

Bob L. Latham, Jr., OBA #15779
Lance Freije, OBA #18559
LATHAM, WAGNER, STEELE &
         LEHMAN, P.C.
Spirit Tower, Suite 500
1800 South Baltimore
Tulsa, Oklahoma 74119
Telephone:  (918) 382-7523
Facsimile:  (918)-382-7541
Email:  lfreije@lswsl.com

ATTORNEYS FOR DEFENDANT

26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ERICA R. ZIMMERMAN,<br>an Individual<br>          Plaintiff,<br><br>vs.<br><br>AHS, TULSA REGIONAL MEDICAL<br>CENTER, LLC, d/b/a<br>OKLAHOMA STATE UNIVERSITY<br>MEDICAL CENTER,<br>a Foreign Limited Liability Company<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CASE NO. 11-CV-00073-CVE-TLW |

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that a true and correct copy of the within and foregoing DEFENDANT'S MOTION TO COMPEL DISCOVERY AND BRIEF IN SUPPORT was electronically transmitted to the Clerk of Court using the ECF system for filing and transmittal of the foregoing to the following ECF registrants:

Daniel E. Smolen, Esq.
Miranda R. Russell, Esq.
Smolen, Smolen & Roytman, PLLC
701 S. Cincinnati Avenue
Tulsa, OK  74119

     On this 26th day of September, 2011.

/s/ Amelia M. Willis
Amelia M. Willis (*Pro Hac Vice*)
Georgia Bar No. 055872
OGLETREE,   DEAKINS,   NASH   SMOAK
& STEWART, P.C.
191 Peachtree Street, N.E. – Suite 4800
Atlanta, Georgia 30303
(404) 881-1300
Counsel for Defendant
