# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ERICA R. ZIMMERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 11-CV-0073-CVE-TLW** |
| | ) | |
| AHS TULSA REGIONAL MEDICAL | ) | |
| CENTER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court are Defendant's Motion for Summary Judgment and Incorporated Brief in Support (Dkt. ## 50, 52)[1] and Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. # 62). Defendant seeks summary judgment on plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA), and the Oklahoma Anti-Discrimination Act, OKLA. STAT. tit. 25, § 1101 et seq. (OADA). Dkt. # 50. Plaintiff seeks summary judgment as to liability on her claims, and asks the Court to limit the jury trial of this matter to the issue of damages. Dkt. # 62, at 13.

## I.

Erica R. Zimmerman was hired by AHS Tulsa Regional Medical Center, LLC d/b/a Oklahoma State University Medical Center (the Hospital) in 1999. Zimmerman worked as a registration representative and her manager was Julie Willis. In 2005, Zimmerman began working as a registration representative in the emergency room (ER), and she reported to registration

---

[1] Defendant filed a redacted motion (Dkt. # 50) and an unredacted motion under seal (Dkt. # 52). For ease of reference, the redacted version will be cited herein unless otherwise noted.

supervisor Sandra Moore.  Willis was Moore's supervisor, and Willis continued to have managerial authority over Zimmerman.  As a registration representative in the ER, plaintiff's primary duties were to register within 15 minutes patients who reported to the ER for treatment, collect insurance co-payments or deposits, and scan medical records.  Zimmerman acknowledges that the registration department maintained a standard of completing a patient registration within 15 minutes, and it generally took much less than 15 minutes to register a new patient.  Dkt. # 50-9, at 6-7.  In May 2008, Zimmerman was promoted to the position of lead or senior registration representative, but the parties dispute whether this position was supervisory in nature.[2]  Willis testified in her deposition that the difference between a registration representative and senior registration representative is that a senior representative "is responsible to be sure that all of the tasks are completed on the shift . . . [and] [t]hey're kind of the go-to person if an employee has questions."  Dkt. # 50-7, at 12.  Zimmerman normally worked full-time on Sunday through Wednesday, and she most often worked with registration representatives Courtney Cantrell, Binoy Luke, Teresa Harper, and Diane Peterson.

On March 11, 2009, Cantrell complained to Willis about Zimmerman's performance and told Willis that she felt as if she were working alone on her shift.  Dkt. # 50-5, at 3.  Cantrell also alleged that Zimmerman "1) had been slow, taking 30 minutes to admit one patient; 2) had been on excessive personal calls; 3) by about 2:30 a.m., kept acting like she was falling asleep; 4) had habitually been late for work; 5) had been frequently leaving the department and specifically, was missing for the first 30-45 minutes of her shift on the previous Monday; and 6) had not maintained

---

[2]     Plaintiff claims that the lead registration representative had additional responsibilities, and Willis advised her that "people are going to complain."  Dkt. # 72, at 7.  However, plaintiff has not attached the cited page of her deposition that allegedly supports her assertion, and there is no evidence in the summary judgment record to support plaintiff's claim that the lead registration representative had additional responsibilities.

a professional appearance." Id. at 3-4. Willis also received a complaint from Harper on March 11, 2009 with many of the same complaints. Id. at 4. In addition, Harper alleged that Zimmerman had dark circles under her eyes and frazzled hair, and that Zimmerman was always tired and "possibly high."[3] Id. On March 19, 2009, Willis received additional complaints from employees that Zimmerman was taking an excessive number of personal calls and was not completing departmental tasks. Id. Zimmerman claims that she talked to Moore sometime before March 25, 2009, and told Moore that her "coping skills were down" and she needed time off. Dkt. # 72-1, at 22. Moore allegedly responded that Zimmerman would have to wait at least a month before taking any time off. Id.

Willis met with Zimmerman on March 25, 2009, and held a verbal coaching session. Willis advised Zimmerman that she had received complaints that Zimmerman was frequently absent from the work area and was not completing her work. Dkt. # 72-3, at 1. Willis informed Zimmerman that failure to correct these deficiencies would result in further disciplinary action. Id. Willis' notes from the verbal coaching session show that Zimmerman claimed to be on a new medication and that Zimmerman was having difficulty adjusting to the medicine.[4] Dkt. # 72-4, at 1. Zimmerman states

---

[3]    The Court notes that the record establishes that plaintiff's co-workers made statements to the effect that plaintiff may have been taking illegal drugs. However, this was not the reason for plaintiff's termination and the record contains no evidence of drug testing clearly establishing that plaintiff was taking an illegal substance. The Court makes no finding as to whether plaintiff was taking illegal drugs, but evidence of co-worker's statement about plaintiff's possible use of illegal drugs is relevant to the extent these statements were considered by the Hospital in its capacity as plaintiff's employer.

[4]    Plaintiff states in her response that she asked for time off because her coping skills were decreased due to the medication, but this is not documented in Willis' notes. See Dkt. # 72, at 8. The deposition testimony cited by plaintiff does not support this statement. Instead, it shows that plaintiff mentioned her medication and reduced coping skills at a subsequent meeting on April 15, 2009. Dkt. # 72-1, at 10.

that she cannot recall what medication she was taking or which physician was treating her at the time, but her medical records show that she was taking Phenzene, an amphetamine prescribed by a physician for weight loss. Dkt. # 50-9, at 11; Dkt. # 52-2, at 3. Zimmerman did not ask for any type of accommodation, and she recalls that Willis noted Zimmerman's tenure of employment and expressed a desire to help Zimmerman with her job performance issues. Dkt. # 50-9, at 12. Zimmerman requested to use vacation time from March 26 to April 11, 2011, and her request was approved. Zimmerman's time sheets show that her leave was documented as paid time off, rather than FMLA leave, and there is no evidence that Zimmerman requested FMLA leave. Dkt. # 50-7, at 109. While taking paid time off, Zimmerman visited Jason Stansill, M.D., and was diagnosed with anxiety and depression. Dkt. # 52-10, at 13-14.

Zimmerman returned to work on April 12, 2011, and Willis received a complaint on April 15, 2009, that Zimmerman was absent during her shift for long periods of time and that she was not getting her work done. Dkt. # 52-7, at 44. In particular, a co-worker alleged that Zimmerman met an unidentified man outside the ER, and that she did not clock out before leaving the ER. Willis and Moore viewed security video of the relevant time period, and observed Zimmerman outside of the ER talking to a man while she was still clocked in for work. Dkt. # 50-7, at 8; Dkt. # 50-8, at 13. Willis and Moore met with Zimmerman to discuss these complaints, and Willis issued a verbal warning to Zimmerman. Dkt. # 50-8, at 26. Zimmerman refused to sign the written record of her formal discipline. Id. Zimmerman again claimed that she was trying to adjust to her medication, and Willis offered Zimmerman a 30 day leave of absence. Dkt. # 50-7, at 44. Zimmerman did not apply for FMLA leave following the verbal warning, and she returned to work. On April 20, 2009, Cantrell and Luke both complained about Zimmerman's job performance. Cantrell claimed that

Zimmerman was not completing her work and that Zimmerman's performance was declining. Dkt. # 50-5, at 5. Luke complained that Zimmerman had been rude to him, but Zimmerman later apologized to Luke for her conduct and blamed her behavior on her personal problems, medication, and depression. Id.

Zimmerman visited Dr. Stansill on April 21, 2009, and Dr. Stansill wrote a note requesting that Zimmerman be placed on FMLA leave for 60 days. Dkt. # 52-10, at 22. Zimmerman completed her FMLA paperwork the same day and her request for FMLA leave was immediately granted. Dkt. # 50-6, at 4. There is no dispute that Zimmerman previously notified Willis about her medication and reduced coping skills, but Willis testified in her deposition that Zimmerman's application for FMLA leave was the first notice she received that Zimmerman had been diagnosed with depression. Dkt. # 50-7, at 9. Zimmerman was granted FMLA leave from April 21 to June 15, 2009. Dkt. # 52-10, at 37.

On May 5, 2009, Zimmerman reported to the ER for medical treatment for chest pain, and she tested positive for amphetamines. Dkt. # 52-1, at 6. She informed the ER physician that she was taking diet pills, but the physician noted in plaintiff's record that he was unsure if Zimmerman was being truthful. Id. at 4. Dr. Stansill saw Zimmerman on June 4, 2009 and determined that she was ready to return to work. Dr. Stansill wrote a note stating that Zimmerman could return to work on June 7, 2009. Dkt. # 52-10, at 31. Zimmerman arrived for to work on June 7, 2009, but she did not bring her medical release and she was not permitted to work. Dkt. # 50-7, at 26. Willis also advised Zimmerman that she wanted to speak to Zimmerman about her expectations before Zimmerman returned to work. Dkt. # 50-7, at 45. Zimmerman called Willis on June 8, 2009 and stated that she wanted some additional time off, and they agreed that Zimmerman would be scheduled for a shift

on June 14, 2009.  Id.  Internal e-mails between Willis and the human resources department show that the human resources department believed that Zimmerman should be permitted to return to work if she could perform the essential functions of her job.  Dkt. # 72-5, at 1.  A human resources employee also suggested that Zimmerman would need to apply for intermittent FMLA leave if she were going to have recurring problems with her depression or medication, but Zimmerman did not file such an application.  Id.

The Hospital maintains a complaint hotline for employees and the Hospital received a hotline call concerning Zimmerman on June 16, 2009.  The caller stated that Zimmerman "displayed jittery and spastic behavior, paced back and forth, and made several visits to the restroom," and the caller believed that Zimmerman was suffering from a drug addiction problem.  Dkt. # 72-8, at 1.  The caller described Zimmerman's appearance as "ghost-like."  Id.  No action was taken against Zimmerman as a direct result of this call, but Julie Eccleston, the human resources director for the Hospital, asked Willis to document "everything" with respect to Zimmerman's job performance and behavior.  Dkt. # 50-4, at 3.  On June 22, 2009, Luke sent an e-mail to Willis complaining that Zimmerman's job performance was "worse than before" and that she was not able to do her job.  Dkt. # 50-7-, at 80.  Willis investigated Luke's complaint, and noted that Zimmerman had exhibited "strange behavior" on June 21, 2009.  This behavior included talking to herself, pacing, walking with an unbalanced gait, and appearing jittery.  Id. at 45.  Willis asked Luke to send a follow-up email recording all of his complaints and any unusual behavior by Zimmerman that he observed. In addition to the complaints already noted, he stated that Zimmerman took numerous personal calls and had a personal visitor, and that she wasted time and took excessive breaks.  Id. at 83.  Harper also complained about Zimmerman's job performance from June 21 to June 23, 2009.  Harper stated

that, on June 21, 2009, Zimmerman "showed up sweating profusely, acting jittery, & talking a lot (not sure who she was talking to most of the time)." Id. at 86. Zimmerman took multiple personal phone calls and had three personal visitors. Id. Zimmerman repeatedly left the work area for long periods of time, and had accepted registration paperwork from only two patients. Zimmerman worked on the paperwork for those two patients for the entire shift. Id. On June 22, 2009, Zimmerman's performance "wasn't any better" and she continued to receive personal phone calls and emails. Id. Harper observed the same behavior by Zimmerman on June 23, 2009, and overheard one personal phone call in which Zimmerman asked the caller to bring her a "little glass vial." Id.

On June 29, 2009, Willis met with Zimmerman to discuss the most recent employee complaints. Zimmerman admitted that she had some difficulties when she returned to work, but felt that her job performance was improving. Dkt. # 50-5, at 6. She also admitted to taking too many personal phone calls and breaks, but she alleged that other employees engaged in the same behaviors. Id. Willis advised Zimmerman to report any issues about her co-workers, but Zimmerman never mentioned the issue again. Id. Willis spoke to Cantrell about Zimmerman on June 30, 2009, and Cantrell stated that Zimmerman's job performance had improved in past few days. Dkt. # 72-4, at 2. Willis chose not to issue any formal discipline to Zimmerman as a result of the complaints about Zimmerman's behavior from June 21 to 23, 2009. Zimmerman did not attribute her behavior during this time period to her medication or depression, and she testified in her deposition that her behavior was consistent with her conduct before June 2009. Dkt. # 50-9, at 16, 22. Willis informed the human resources department that Zimmerman had made "considerable

progress" in the past week, but Zimmerman "is very much aware that the next steps are written counseling, suspension, and termination." Dkt. # 50-7, at 63.

Zimmerman was 40 minutes late for her shift on July 5, 2009. Dkt. # 50-6, at 3. On July 6, 2009, Zimmerman called in sick about one hour before her shift was to begin. Dkt. # 50-5, at 8. Zimmerman arrived late to work on July 8, 2009 and she was "shaking and wired, looking disheveled." Id. Moore worked with Zimmerman for several hours of Zimmerman's shift, and observed Zimmerman "talking to herself, talking excessively and not making any sense." Id. It took Zimmerman over an hour to admit three patients and one patient left the ER due to Zimmerman's strange behavior. Id. Moore also reported that Zimmerman's workspace was extremely disorganized, and that she took several personal phone calls during her shift. Dkt. # 50-8, at 23. Zimmerman claimed that she was tired because she had been arguing with her boyfriend and her children had kept her awake. Id. at 7. Willis asked Zimmerman to meet with Willis before her shift on July 10, 2009, to hear Zimmerman's explanation for her behavior and possibly to issue a written counseling. Dkt. # 50-7, at 46. Willis issued a written warning to Zimmerman for poor performance and inappropriate conduct, and advised Zimmerman that failure to correct the issues identified in the written warning could result in her termination. Dkt. # 50-5, at 13-14. On July 13, 2009, plaintiff also received a verbal warning for excessive absenteeism, because she had five unexcused absences within one year. Dkt. # 50-8, at 29.

On July 24, 2009, Willis received a report from a triage nurse, Dan Charrier, that Zimmerman had brought a friend to the ER for treatment on July 23, 2009, and that Zimmerman asked Charrier to move her friend ahead of other patients who had previously been admitted for treatment. Dkt. # 50-7, at 21. Charrier told Zimmerman that there were patients in more critical

need of treatment and that her friend would have to wait.  Id.  Charrier did not see Zimmerman move

any papers or change the order of patients to be seen.  However, he observed Zimmerman's friend

being triaged ahead of other patients and he believed that Zimmerman moved her friend ahead of

other patients.  Id.  Zimmerman denies moving her friend's papers or interfering with the operation

of the ER.  Zimmerman claims that an ER physician told her to give her friend a urinalysis cup, and

that the doctor made a decision to treat her friend ahead of other patients.  Dkt. # 72-1, at 18.  Willis

testified in her deposition that doctors do not determine the order of patient treatment in the ER, and

that plaintiff's explanation lacks credibility.  Dkt. # 50-7, at 21-22.

Zimmerman continued to have problems with her work performance.  On July 27, 2009,

Harper complained that Zimmerman was receiving excessive personal calls and was not doing her

work.  Dkt. # 50-7, at 78.  Willis investigated the complaint and found that Zimmerman had

admitted only two patients from 7 p.m. to 11 p.m. on July 26, 2009.  During the same time period,

Luke admitted nine patients, Harper admitted 17 patients, and Cantrell admitted 12 patients.  Id. at

47.  Denise Andrasko, a registration representative, arrived for her shift at 6:30 a.m. and heard loud

music coming from the ER.  Id. at 82.  Andrasko saw Zimmerman dancing around the work area and

"[a]t one point her dancing was very provocative making motions between her legs."  Id.

Zimmerman was talking very fast and laughing very loudly, and Andrasko noticed that

Zimmerman's hands were very shaky.  Id.  Willis viewed the security video and described

Zimmerman's dancing as "very inappropriate."[5]  Id. at 25.  Moore also watched the video and

---

[5]     Plaintiff's deposition testimony is equivocal concerning the events of July 27, 2009.
        Plaintiff initially testified that she did not "believe" that she was dancing. Dkt. # 50-9, at 20.
        However, she later states that she was "being silly" and "things like that happened every
        night," and she appears to admit to dancing in a less provocative manner.  Id. at 20-21.

observed Zimmerman engaging in "exotic dancing." Dkt. # 50-8, at 11. On July 30, 2009, Luke complained about Zimmerman's performance on July 28, 2009, because Zimmerman was receiving personal calls, disappearing during her shift, and taking too long to admit patients. Dkt. # 50-5, at 9. Also on July 30, 2009, Hospital employee Stephanie Lee reported to Willis that she saw Zimmerman take some pills on July 27, 2009, and that Zimmerman appeared to be high. Dkt. # 50-7, at 85. Lee claimed that Zimmerman was very unsteady and drowsy, and that she almost fell over. Willis also learned that Zimmerman scanned two patients' charts together on July 28, 2009, and that the error was not corrected before the patients were seen for treatment. Dkt. # 50-5, at 9-10.

On July 31, 2009, Willis collected documentation concerning all of the complaints about Zimmerman between July 24 and 31, 2009, and she provided the documents to the human resources department. Willis requested approval to terminate Zimmerman's employment without following the next step in the progressive disciplinary policy based on Zimmerman's repeated disciplinary issues and the ER incident on July 23, 2009. Id. at 11. The human resources department reviewed Willis' request the same day and determined that it was appropriate to terminate Zimmerman's employment without strictly following the progressive disciplinary policy. Dkt. # 63-1, at 16. The decision to terminate Zimmerman's employment was made on July 31, 2009, but Zimmerman was not scheduled to work until August 3, 2009. Willis could have proceeded with the termination on July 31, 2009, but she decided to wait until Zimmerman reported for work on August 3, 2009. Id.

Willis and Moore met with Zimmerman on August 3, 2009, and informed Zimmerman that her employment was terminated. Zimmerman testified that she visited Dr. Stansill before the meeting on August 3, 2009, and that Dr. Stansill released Zimmerman from work for two weeks. Dkt. # 50-9, at 21. Zimmerman claims that she told Willis before the August 3, 2009 meeting that

she would be visiting Dr. Stansill before the meeting, but Zimmerman's deposition testimony is not clear if this issue was discussed at the meeting or if Zimmerman attempted to give Dr. Stansill's note to Willis.[6]  Id.

Zimmerman filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that the Hospital terminated her employment in retaliation for exercising her rights under the FMLA.  Dkt. # 72-14.  On December 15, 2010, Zimmerman filed this case in Tulsa County District Court, Oklahoma, alleging a retaliation claim under the FMLA, a claim of disability discrimination under the ADA, and a state law claim of wrongful discharge in violation of an Oklahoma public policy.  Dkt. # 2-1.  The Hospital removed the case to this Court based on federal question jurisdiction.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.

---

[6]     Plaintiff relies on the cited deposition testimony to support her statement that she actually attempted to give the medical release note to Willis.  Dkt. # 72, at 18.  However, this is not reasonably supported by the deposition testimony.  Instead, the deposition testimony shows that plaintiff is claiming that Willis was on notice of her doctor's appointment before the August 3, 2009 meeting, but plaintiff never testified that she handed or attempted to hand the note to Willis on August 3, 2009.  See Dkt. # 50-9, at 21.

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant seeks summary judgment on each of plaintiff's claims, and argues that plaintiff's termination was not the result of unlawful employment discrimination. Dkt. # 50. Plaintiff has filed a motion for summary judgment as to liability only on each of her claims, and asserts that the only issue remaining for a jury trial is the appropriate amount of damages. Dkt. # 62.

## A.

Defendant argues that plaintiff must show that her employment was terminated solely because of her disability to prevail on her ADA discrimination claim. Dkt. # 50, at 19-21.

Defendant also asserts that it had a legitimate non-discriminatory reason for terminating plaintiff's employment and there is no evidence that this reason was pretextual.  Id. at 22-26.  Plaintiff argues that she is entitled to summary judgment on her ADA claim as to liability, because she can establish a prima facie case of disability discrimination and defendant's reason for terminating her employment is pretextual.  Dkt. # 62, at 9.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  ADA discrimination cases are governed by the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  Pursuant to this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If she does so, "then the defendant must offer a legitimate, non-[discriminatory] reason for the employment action.  The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations omitted).  In order to defeat a motion for summary judgment, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual-i.e., unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).

In order to establish a prima facie case under the ADA, a plaintiff must demonstrate:

(1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer terminated her employment under circumstances which give rise to an inference that the termination was based on her disability.

Morgan, 108 F.3d at 1324 (internal citations omitted).  Defendant argues that plaintiff must prove that disability was the sole cause of her termination to establish a prima facie case of disability discrimination based on the Supreme Court's decision in Gross v. FBL Financial Servs., Inc., 557 U.S. 167 (2009).  However, Gross concerned the application of the mixed motive theory under Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (ADEA), and it did not address the plaintiff's burden to prove discrimination under the ADA.  The Seventh Circuit has found that the reasoning in Gross also applies to the ADA, and an ADA plaintiff may not rely on a mixed motive theory.  Serwatka v. Rockwell Automation, Inc., 591 F.3d 957 (7th Cir. 2010).  However, the Tenth Circuit has continued to apply the familiar burden-shifting analysis to ADA claims and has not required ADA plaintiffs to prove that disability discrimination was the sole or "but-for" cause of an adverse employment action.  See Carter v. Pathfinder Energy Servs., Inc., ___ F.3d ___, 2011 WL 5222882 (10th Cir. Nov. 3, 2011); Johnson v. Weld County, Colorado, 594 F.3d 1202 (10th Cir. 2010); Hennagir v. Utah Dep't of Corrections, 587 F.3d 1255 (10th Cir. 2009).  Thus, the Court finds that plaintiff is not required to prove that her disability was the sole or "but-for" cause of termination to survive summary judgment on her ADA claim.

Defendant does not contest that plaintiff was disabled under the ADA or that plaintiff was able to perform the essential functions of her job, but defendant does challenge the third prong of plaintiff's prima facie case of disability discrimination.  Defendant argues that many of the disciplinary infractions leading to plaintiff's termination were unrelated to her alleged disability, and that she has not shown that her employment was terminated under circumstances giving rise to an inference of disability discrimination.  Dkt. # 50, at 22.  The Court agrees with defendant that the July 23, 2009 incident in which plaintiff allegedly moved her friend's paperwork ahead of other

patients with more critical needs has no possible relation to plaintiff's depression, anxiety, or medication. The Court also notes that much of plaintiff's behavior is not likely related to depression, anxiety, or the side effects of medication. For example, plaintiff has not explained how taking excessive personal calls or failing to clock out when leaving during her shift could reasonably be related to a disability. However, the Court will assume that some of plaintiff's unusual behavior could be attributed to depression or anxiety, and will not dispose of plaintiff's ADA claim at the level of the prima facie case.

Defendant states that plaintiff's "poor performance and numerous instances of bizarre and/or inappropriate behaviors" provided a legitimate, non-discriminatory reason for terminating her employment. Dkt. # 50, at 22. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007). Defendant has met its burden to state a legitimate, non-discriminatory reason for terminating plaintiff's employment.

At this stage of the proceeding, the burden shifts to plaintiff to show that defendant's explanation for terminating plaintiff's employment is pretextual. Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v.

Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  A plaintiff typically attempts to satisfy his or her burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan, 108 F.3d at 1323).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff claims that defendant disciplined other employees engaging in similar misconduct less severely, and that this shows that defendant's stated reason for terminating her employment is pretextual.  The Tenth Circuit has recognized that a plaintiff may establish pretext by showing that "the employer 'treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness' in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff."  Swackhammer v. Sprint/United Management Co., 493 F.3d 1160, 1168 (10th Cir. 2007).  An employee is similarly situated if the employee "deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1232 (10th Cir. 2000).  "Work histories, company policies applicable to the plaintiff and the comparator, and other relevant employment circumstances should be considered when determining whether employees are similarly situated."  Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005).  Plaintiff has the burden to produce evidence that employees are similarly situated.  Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1121 n.4 (10th Cir. 2007).

Plaintiff claims that Terese Matlock, another registration representative, complained that "Megan" was not completing her work, and that Willis failed to investigate the matter. Dkt. # 72, at 28. Matlock did send Willis an e-mail complaining about Megan's work performance. Dkt. # 72-12. However, Matlock did not ask Willis to investigate the matter and Matlock offered to apologize to Megan to the extent that her complaint could be construed as gossip. Id. However, plaintiff makes no attempt to show that Megan engaged in misconduct with same frequency and of the same severity as that of plaintiff. Willis received numerous complaints from several registration representatives that plaintiff was not completing her work, was possibly using illegal drugs, and was missing from work for large periods of time. Plaintiff also engaged in an inappropriate dance that was captured on videotape and allegedly moved her friend's paperwork ahead of other patients waiting for treatment in the ER. This conduct is substantially more frequent and severe than the one instance in which Megan was allegedly not completing her work, and the co-worker making the complaint about Megan did not request an investigation. Megan may not be considered as a similarly situated employee.

Plaintiff argues that defendant disciplined her for conduct related to her disabilities and that defendant terminated her employment less than two months after she returned from FMLA leave, and that this shows that defendant's stated reason for terminating her employment is pretextual. Plaintiff assumes that any discipline issued for unusual behavior was inappropriate, because these behaviors could have been caused by her medication or depression.[7] However, the evidence does

---

[7]   The evidence cited by plaintiff does not support her statement that all of her improper behaviors could have been caused by her medication or depression. Dr. Stansill testified that it was "possible" that shakiness or an unsteady gait could possibly be a side effect of medication, but the medication would not explain why plaintiff talked to herself or spoke too (continued on next page)

not support plaintiff's assumption and much of plaintiff's behavior is unrelated to her medication or disability. For example, plaintiff has made no attempt to show that expediting her friend's treatment on July 23, 2009 was related to her disability, and this incident was the basis for Willis' request to skip the next step of the progressive disciplinary policy. The Court notes that plaintiff was disciplined for taking excessive personal calls and disappearing from the ER without clocking out, before and after her FMLA leave, and the plaintiff's argument that she was unfairly disciplined because of her medical condition is not evidence of pretext. Plaintiff claims that defendant was aware that she might need intermittent FMLA leave, but continued to discipline her for certain behaviors and failed to offer her paperwork for intermittent FMLA leave. However, plaintiff never requested intermittent FMLA leave and did not make a second request for FMLA leave until defendant had already made a final decision to terminate her employment. Even if plaintiff were correct that she received discipline for conduct related to a disability, an employer is not required to excuse an employee's misconduct merely because it potentially relates to an employee's disability. Hamilton v. Southwestern Bell Telephone Co., 136 F.3d 1047, 1052 (5th Cir. 1998); Canales-Jacobs v. New York State Office of Court Admin., 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009). An employer may not unfairly discriminate against an employee with a disability by treating him or her differently than similarly situated non-disabled employees but, at the same time, a disabled employee must comply with the employer's workplace rules and is subject to adverse employment actions for violating those rules. Rose v. Laskey, 110 Fed. Appx. 136, 139 (1st Cir. 2004); Hill v. Kansas City Area Transp. Authority, 181 F.3d 891, 894 (8th Cir. 1999). The mere fact

_____

(continued from previous page)
loudly. Dkt. # 72-6, at 2-5. Dr. Stansill does not actually state an opinion as to whether any behaviors noted by defendant were actually the side effect of plaintiff's medication.

that plaintiff may have been disciplined for behaviors that she claims were related to her disability is not evidence of pretext. However, plaintiff has not shown that she was actually disciplined for behaviors caused by her depression or medication, and this argument does not support plaintiff's assertion that defendant's legitimate, non-discriminatory reason for terminating her employment is pretextual.

Plaintiff denies that she moved her friend's paperwork in the ER on July 23, 2009, and she claims that her denial is sufficient to create a genuine issue of material fact concerning the validity of defendant's finding that she engaged in this conduct. However, the Court may not second-guess the employer's findings on matters of internal discipline if the employer acted in good faith and honestly believed that the employee engaged in misconduct. Exum v. United States Olympic Committee, 389 F.3d 1130, 1137-38 (10th Cir. 2004). Willis spoke to the nurse who alleged that plaintiff moved her friend's paperwork, and found his statement to be credible. Dkt. # 50-7, at 47. Willis also explained that plaintiff's explanation that an ER doctor may have changed the treatment order of waiting patients lacks credibility, and that this is not standard practice in the ER. Id. at 21-22, 26. The record is clear that Willis sincerely believed that plaintiff moved her friend's paperwork, and the Court will not question the Hospital's conclusion that this occurred. Plaintiff also denies that she engaged in an erotic dance in the ER. Willis received a complaint from a Hospital employee, and Willis and Moore personally viewed the security video. Plaintiff is correct that the security video no longer exists, but this does not detract from Willis' and Moore's finding that plaintiff's conduct was improper.

Plaintiff claims that defendant failed to substantiate the allegations of her poor work performance with an adequate investigation, and that defendant cannot show that it acted in good

faith when it terminated her employment. Dkt. # 72, at 28-29. However, the record is clear that Willis followed up on employee complaints and kept detailed notes of plaintiff's disciplinary problems. Dkt. # 50-5, at 25-27. Defendant also documented formal disciplinary action in plaintiff's file and met with plaintiff each time such action was taken. See Dkt. # 72-3; Dkt. # 72-9; Dkt. # 72-10. The evidence shows that Willis refrained from disciplining plaintiff on July 1, 2009, because she received reports from Cantrell that plaintiff's performance was improving. Dkt. # 50-5, at 26-27. This suggests that Willis did not precipitately or unfairly discipline plaintiff on other occasions and, unless plaintiff's behavior was particularly egregious, formal discipline was issued to plaintiff only after several complaints were received and plaintiff's performance failed to improve over some period of time. See Dkt. # 50-5, at 28 (April 14, 2009 verbal warning issued to plaintiff for conduct dating from March 25 to April 12, 2009); id. at 13 (July 10, 2009 written warning for strange behavior and poor performance from June 21 to July 8, 2009). The Court does not find any evidence of bad faith in the manner in which plaintiff was disciplined and, quite to the contrary, defendant fully documented any discipline issued to plaintiff and gave her an opportunity to respond to any allegations before discipline was issued.

Plaintiff claims that Willis refused to allow her to return from FMLA leave without a face-to-face meeting about Willis' expectations, and that this is evidence of pretext because the Hospital advised Willis that plaintiff should be permitted to return as soon as her doctor determined that plaintiff was medically ready to work. However, plaintiff fails to note that she was not permitted to return to work on June 7, 2009 because she did not bring her doctor's release note and that she did not meet with Willis before returning to work. Dkt. # 50-7, at 26. Instead of retrieving the doctor's note and reporting to work, plaintiff called Willis and requested additional time off. Id. at

45. Due to plaintiff's conduct, it is irrelevant that Willis requested to have a meeting with plaintiff before she returned to work, because plaintiff never attempted to comply with the requirement to produce a copy of her medical release. The Court also notes that this occurred approximately two months before plaintiff's termination and plaintiff does not explain how this incident relates to her termination. Willis did not terminate plaintiff's employment when she returned from FMLA leave, and she gave plaintiff numerous opportunities to correct deficiencies with her job performance. Willis was aware of the Hospital's progressive disciplinary policy and requested to terminate plaintiff's employment without a suspension due to the severity of plaintiff's misconduct. Plaintiff has not shown that Willis' refusal to allow plaintiff to return to work had any relation to plaintiff's FMLA leave or her termination, and this is not evidence of pretext.

Defendant also argues that plaintiff cannot prevail on an ADA claim under a failure to accommodate theory, because plaintiff received FMLA leave when she requested it and was not denied any other accommodation. Plaintiff claims that Moore failed to give her FMLA paperwork in March 2009 when she notified Moore that "her coping skills were down" and that Willis failed to consider plaintiff's request for FMLA leave on August 3, 2009, and this shows that defendant denied plaintiff's requests for reasonable accommodations. Under some circumstances, limited time off for medical leave may be considered an accommodation. See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 967 (10th Cir. 2002). However, plaintiff has not shown that she ever made a request for an accommodation that was denied by her employer, and there is no possibility that she can prevail under a failure to accommodate theory. An employer's duty to offer an accommodation to an employee is not triggered until the employee puts the employer on notice of the employee's disability. EEOC v. C.R. England, Inc., 644 F.3d 1028 (10th Cir. 2011). Likewise,

under the FMLA, an employer's duty to offer FMLA leave is not triggered unless the employee provides sufficient notice to the employer that leave is necessary under the FMLA. Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043 (8th Cir. 1999). Plaintiff claims that Moore failed to offer her FMLA paperwork in March 2009, but she has not shown that Moore was on notice of plaintiff's alleged disability or that plaintiff's reduced coping skills were related to a medical condition. Plaintiff's statement that her "coping skills were down" would not have put her employer on notice that she was suffering from a disability, and Willis testified in her deposition that she was not aware of plaintiff's depression until April 2009 at the earliest. Plaintiff has cited no authority suggesting that reduced coping skills qualifies as a disability under the ADA, and her March 2009 statement to Moore did not trigger defendant's obligation to offer an accommodation or FMLA leave. Plaintiff also claims that Willis refused to accept Dr. Stansill's note releasing her from work as of August 3, 2011, but it is clear that the decision to terminate plaintiff's employment was made on July 31, 2011. Willis had no obligation to consider a request for FMLA leave when only the ministerial act of informing plaintiff of her termination remained. See Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1003 (10th Cir. 2011) (plaintiff failed to show discrimination when she requested FMLA leave after her termination was effective). Plaintiff made one request for FMLA leave during her employment and the request was granted. It is clear that defendant granted plaintiff FMLA leave when requested by plaintiff, and it was under no obligation to offer plaintiff FMLA leave based on a vague statement about plaintiff's coping skills or after the termination of plaintiff's employment.

Viewing the evidence in the light most favorable to plaintiff, the Court finds no evidence tending to show that defendant's legitimate, non-discriminatory reason for terminating plaintiff's employment is unworthy of belief. Plaintiff repeatedly and regularly violated defendant's standards

of performance and workplace conduct, and defendant gave plaintiff numerous chances to improve her performance. Defendant terminated plaintiff's employment after two more severe instances of misconduct occurred near the end of July 2009. Defendant considered its progressive disciplinary policy, and exercised its discretion to skip the step of a suspension before terminating plaintiff's employment. Considering all of the evidence, plaintiff has not shown that defendant was motivated by intent to discriminate against plaintiff because of a disability, and summary judgment should be entered in favor of defendant on plaintiff's ADA claim.

**B.**

Defendant argues that plaintiff has not shown that her employment was terminated in retaliation for taking FMLA leave, and that it is entitled to summary judgment on plaintiff's FMLA retaliation claim. Plaintiff responds that her employment was terminated less than two months after she took FMLA leave and that defendant improperly disciplined her for actions related to a disability, and she asks the Court to enter summary judgment in her favor as to liability on her FMLA claim.[8]

The FMLA prohibits an employer from discriminating against an employee for opposing a practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). Like ADA claims, FMLA retaliation claims are subject to the McDonnell Douglas burden-shifting framework. Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282,1287 (10th Cir. 2007). To make out a prima facie FMLA

---

[8]     Defendant believes that plaintiff may be attempting to assert an FMLA interference claim, in addition to an FMLA claim based on a retaliation theory. Dkt. # 81, at 19-20. However, plaintiff's petition clearly states that she is alleging an FMLA retaliation claim. Dkt. # 2-1, at 5. Plaintiff does not make any argument in response to defendant's motion for summary judgment or in her own motion for summary judgment that could be construed as an assertion of an FMLA interference claim. Thus, the Court finds that plaintiff has not asserted an FMLA interference claim and will not consider this issue.

retaliation claim, a plaintiff must show that "(1) she engaged in a protected activity; (2) [her employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." Metzler, 464 F.3d at 1171.  The Tenth Circuit characterizes "the showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the employer." Campbell, 478 F.3d at 1287 (quoting Metzler, 464 F.3d at 1171).  If plaintiff can establish a prima facie case of FMLA retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action.  Id. at 1290.  The burden shifts back to the plaintiff to "show that there is a genuine dispute of material fact as to whether [the employer's] reason for terminating her are pretextual."  Id. (quoting Metzler, 464 F.3d at 1172).  To establish a genuine issue of material fact as to pretext, a plaintiff cannot rely solely on temporal proximity of her FMLA leave and the adverse employment action and must offer some other evidence of retaliatory motive.  Metzler, 464 F.3d at 1172.  An employee who requests FMLA leave has "no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitted the request."  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1262 (10th Cir. 1998).

Defendant does not contest that plaintiff can establish the first and second elements of a prima facie case of FMLA retaliation, but argues that plaintiff has not shown a causal connection between her FMLA leave and her termination.  The Court finds that plaintiff has shown temporal proximity between her FMLA leave and her termination, because plaintiff's employment was terminated about two months after she returned from FMLA leave.  Metzler, 464 F.3d at 1171 (temporal proximity between FMLA leave and adverse employment action is sufficient at prima

facie stage to raise an inference of discrimination). Defendant has stated a legitimate non-discriminatory reason for terminating plaintiff's employment. See supra at 15. The burden shifts to plaintiff to show that defendant's legitimate, non-discriminatory reason for terminating her employment is pretextual.

Plaintiff relies on the same arguments to show pretext for her FMLA claim that have already been considered in the context of her ADA claim. The Court has rejected plaintiff's arguments that defendant improperly disciplined her or treated her differently than other employees, and has found that defendant's legitimate, non-discriminatory reason for terminating plaintiff's employment is not pretext for disability discrimination. The only evidence tending to raise an inference of discrimination is the timing of plaintiff's termination, but this is insufficient as a matter of law to satisfy plaintiff's burden to show pretext on an FMLA retaliation claim. Metzler, 464 F.3d at 1172. Thus, defendant is also entitled to summary judgment on plaintiff's FMLA retaliation claim.[9]

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Incorporated Brief in Support (Dkt. ## 50, 52) is **granted**, and Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. # 62) is **denied**. A separate judgment is entered herewith.

---

[9] Plaintiff has alleged a state law claim for wrongful termination in violation of an Oklahoma public policy. The Tenth Circuit has repeatedly recognized that a plaintiff's failure to establish federal discrimination claims is equally dispositive of Burk claims. See Kirkpatrick v. Pfizer, Inc., 391 Fed Appx. 712, 719 n.3 (10th Cir. Aug. 12, 2010); Brown v. Bd. of Regents for the Oklahoma Agriculture and Mechanical Colleges for Langston University, 353 Fed. Appx. 169, 173 (10th Cir. Nov. 30, 2009); Ruleford v. Tulsa World Publ'g Co., 266 Fed. App'x 778, 784 (10th Cir. Feb. 22, 2008); Smith v. Okla. ex rel. Tulsa County Dist. Attorney, 245 Fed. Appx. 807, 818 (10th Cir. Aug. 23, 2007). It is not clear that a wrongful termination claim under Oklahoma law may be based on disability discrimination or retaliation for taking FMLA leave, but it is unnecessary to resolve these issues as plaintiff's state law wrongful termination claim fails for the same reason as her federal law claims.

**DATED** this 8th day of December, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT